The Law Office of David J. Hamilton
David J. Hamilton (SBN 117857)
2299 Bowlin Lane
Twin Falls, Idaho 83301-8102
Telephone: (661) 295-3000
Email: dhamilton@hamiltonlaw.biz

Law Offices of Glenn Powell & Associates, LLC
Glenn Powell  (Pro Hac Vice)
49 Sunset Terrace
P.O. Box 74
Collinsville, CT 06022
Telephone: (860) 693-1747
Email: lawofficesofgpowell@comcast.net

Attorney for Defendants Register Tapes
Unlimited, LP and Register Tapes Unlimited, Inc.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBERT TERRY, *et al.*,<br><br>　　　　　　Plaintiffs,<br>　vs.<br><br>REGISTER TAPES UNLIMITED, INC., *et al.*,<br><br>　　　　　　Defendants. | **Case No. 2:16-cv-00806-WBS-AC**<br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL AGAINST DEFENDANT FOR VIOLATION OF COURT ORDER;**<br><br>**DEFENDANTS' APPLICATION FOR SANCTIONS;**<br><br>**DECLARATIONS FILED SEPARATELY**<br><br>Date: March 20, 2019<br>Time: 10:00 a.m.<br>Courtroom: 26 |

**PRELIMINARY STATEMENT**

Defendants Register Tapes Unlimited, LP ("RTULP") and Register Tapes Unlimited, Inc. ("RTUI")(hereafter collectively "RTU") oppose Plaintiffs' motion in its entirety.  The motion should be denied and Defendants should be awarded their fees and costs associated with opposing this motion.

Before addressing the substance of the motion, a short summary of the facts is in order.

**The RTUI-Freedom Media Contract**

In October 1999, Plaintiff Freedom Media and RTUI entered into an agreement. Pursuant to that agreement, Freedom Media was to assist RTUI in obtaining an agreement with Safeway to provide register tape to Safeway. If RTUI was successful in obtaining a contract with Safeway, RTUI would have the right to sell advertising to third parties which would be printed on the back of the Safeway register tape.

The 1999 agreement between RTUI and Freedom Media further provided that Freedom Media would receive a percentage of the "gross profits" from the sale of the register tape advertising to third party advertisers pursuant to a very specific formula set out in the agreement. A copy of that agreement is attached hereto and also is Exhibit F to the Second Amended Complaint (Document 36-6).

**The RTUI-Safeway Contract**

RTUI and Safeway entered into a contract pursuant to which RTUI provided register tape to Safeway and on which RTUI could place third party advertising. The RTUI-Safeway agreement was signed by Safeway in May 2000 (hereafter the "2000-03 RTUI-Safeway agreement").

The 2000-03 RTUI-Safeway agreement initially covered a limited number of Safeway stores of the Pacific Northwest and provided that RTUI would begin delivering tape to those stores in September 2000. Later, that agreement included some Safeway stores in the Baltimore area beginning in December 2000. Additional Safeway stores were added in the Northwest and, finally, some stores in the Colorado and Wyoming area were added in 2001.[1]

Pursuant to its own terms, the 2000-03 RTUI-Safeway agreement was set to expire on December 1, 2003.

**The "Gross Profit" Formula and Payments to Freedom Media**

The formula for computing the amount, if any, due to Freedom Media under the 2000-03 RTUI-Safeway agreement for income received from third party advertisers was set out in the

---

[1] No plaintiff was a party or even mentioned in the RTUI-Safeway contract.

Defendants' Opposition to Plaintiffs' Motion to Compel for Violation of Court Order

RTUI-Freedom Media contract (attached) as follows:

1. Ten percent of the profit from the sale of register tape advertising to third parties for placement on Safeway tape;
2. minus commissions fixed at 35%
3. minus the cost of tape

> pursuant to the negotiations between RTUI and Freedom Media, the cost of printed tape was set $1.50 per roll and $.94 per roll of blank tape but subject to price fluctuations based on the cost of thermal paper in the future.

*See also* Second Amended Complaint at ¶ 16(d).

There were no gross profits based on this formula in 2000 or 2001. RTUI made payments to Plaintiff Crest Corporation in 2002 and 2003.[2]

Despite the efforts of Terry and other RTUI personnel to extend or create a new agreement with Safeway, the 2000-03 contract expired. Thereafter, RTUI had no right to place ads on Safeway register tape and no longer provided any tape to Safeway. Instead, Safeway signed a nation-wide agreement with a competitor.

**The 2009 RTULP-Safeway Register Tape Agreement**

In about June 2008, there were discussions and proposals exchanged between Safeway and Register Tapes Unlimited, LP (hereafter RTULP) regarding the possibility of entering into an agreement pursuant to which RTULP would provide register tape to Safeway with Defendant. No plaintiff played any role whatsover in those discussions. At the time, no agreement was reached. In fact, in about November 2008, RTULP learned that Safeway had entered into another nation-wide agreement with a competitor.

Several months later, Safeway cancelled it's contract with the competitor and once again negotiated with RTULP. Safeway and RTULP entered into a nation-wide register tape

---

[2] As alleged in the Second Amended Complaint, Terry is the sole owner of Freedom Media. He also is the sole shareholder of Plaintiff Crest Corporation which was created around 2001. From that time forward Terry ran all his business through Crest.

agreement in September 2009 (hereafter the "2009 Safeway-RTULP Agreement"). No plaintiff played any role in the negotiations and no plaintiff is mentioned in that agreement.

**Plaintiffs' Current Claim**

The plaintiffs allege in their complaint they are entitled to a portion of the income RTULP has received from register tape sales pursuant to the 2009 Safeway-RTULP Agreement based on the 1999 RTUI-Freedom Media Agreement. Indeed, ***Plaintiffs' entire claim with regard to the "2009 Safeway-RTULP Agreement is based solely on the one-page document attached hereto.***

## ARGUMENT

Virtually the entire thrust of Terry's motion is with regard to financial information regarding the 2009 Safeway-RTULP Agreement. The gravamen of the motion is that Plaintiffs do not have the information need to calculate damages under that agreement. With one small exception, that is false.

**I.    RTU HAS PROVIDED THE NECESSARY SALES DATA TO PLAINTIFFS.**

Over a year ago, in February 2018, RTU provided Plaintiffs with a 125-page document that listed every contract for register tape to placed at a Safeway store (including Safeway, Vons, Pavillion's, Carrs and others). That document included the contract number, the name of the advertiser, the sales person, the store and the chain were the advertising was to appear, the total contract price and information regarding cancellations and revenue. That document covered 2010 through 2017. Since that time RTU has provided the same Safeway information for the period from September through December 2009. Collectively, there are over 17,700 entries in these spreadsheets. Plaintiffs have sent a recent document request asking that information be updated for 2018. The response is not yet due.

These spreadsheets should account for every contract received regarding Safeway.[3]

---

[3] These spreadsheets often have multiple entries for the same contract. This is readily apparent because of the contract number remains the same. This occurs for many reasons. The contract may have been modified (for example, to include an additional store on the contract). More likely, the original contract may involve multiple stores and there may be an entry for each store for the same amount. The contract may be for multiple years. These issues are obvious.

In addition, RTU provided a random sampling of the actual contracts for each and offered to provide the hard copy of any particular contract should the Plaintiffs have a question. In addition, RTU provided the information regarding contracts written by Crest and copies of the actual contracts to the extent they could be located.

RTU also has provided declarations from its employees explaining how RTU accounts for revenue. For example, the amount received may be less than the contract price based on a number of factors including bankruptcy, other non-payment, cancellation or revisions to a contract. In addition, the typical register tape contract with a third party advertisers is for a year or more. In most every instance, the advertiser pays in installments over the term of the contract, thus all the revenue on a contract is unlikely to be received in the same calendar year. As addressed in the declarations, RTU uses a standard accounting method known as "gap accounting" to account for revenue received over a period of time.

In sum, Plaintiffs have all the sales information regarding Safeway from 2009 through 2017.

Plaintiffs claim RTU has provided contradictory information regarding revenue received from third party advertisers on Safeway register tape. *See* Plaintiffs' Memorandum of Points and Authorities at page 3, lines 18-19 and page 6, lines. Plaintiffs' counsel is partially correct but he is making an "apples and oranges" comparison. In late 2014, Plaintiffs' retained an attorney in San Francisco. That firm and the undersigned had several discussions regarding possible resolution of the matter. *See, e.g.,* Exhibit C to the Second Amended Complaint ((Document 36-3). Plaintiffs' original attorneys claimed Crest had an interest in the current Safeway register tape revenue. Then, as now, RTU argued Crest had no interest in the 2009 Safeway-RTULP Agreement, but even if Crest had an interest, Crest had suffered no damages under the formula set out in the 1999 Freedom Media-RTUI agreement. To that end, a spreadsheet was prepared and provided to opposing counsel which showed a substantial loss every year from 2009 through 2014 under the formula set out in the 1999 Freedom Media-RTUI agreement. See Exhibit H to Boucher's Declaration (Document No 88-10).

As it turns out, the revenue received from third-party advertisers for register tape ads on

Safeway tape set forth in that document is overstated. In addition, there was no attempt made in that document to adjust for increased thermal paper costs. Instead the original $.94 blank and $1.50 per roll figures were used. This actually would work to the ***benefit*** of plaintiffs as the revenue numbers are too high and the tape costs too low. However, even with the overstated revenue numbers and understated costs, there is still a substantial loss under the 1999 Freedom Media-RTUI formula.

## II. RTU HAS NO OBLIGATION TO PROVIDE "ADMINISTRATIVE" COST DATA.

In his summary of the supposed lacking documents set out at page 3 of Plaintiffs memorandum, Plaintiffs claim that "Defendant has provided no proof of [Administrative Costs]. That is correct. Why would RTU provide such information? Why do Plaintiffs need it? Administrative costs are not part of the 1999 Freedom Media-RTUI formula for calculating "gross profits." In his declaration, Plaintiffs' counsel cites to pages 115 through 117 of the Deposition of Doug Endsley taken in October 2018. *See* Boucher Declaration, Exhibit A [Document 88-3]. Apparently counsel did not listen to or review the answers Mr. Endsley provided to his questions:

> Q. Can you tell me what that formula was again?
>
> A. Sure. Sure. Based on the pricing at that time, we were going to charge against the sales, cost of printed and blank tape at $1.50 a roll and $.94 a roll for blank. Okay? And the cost of sales 35 percent. And that would come up to, for the purposes of this example, a gross profit number. Obviously, there's many other expenses in running an operation from gross to net, but for simplicity's sake, that was the formula that we used.

Boucher Decl., Exh. A, page 116-17. Counsel then asked what other expenses there might be. Mr. Endsley reiterated that the formula used was "simple, easy to do, so we did sales less the expenses for tape and -- blank and printed, and cost of sales [i.e., commissions]." Administrative costs simply were not part of the formula.[4]

---

[4]One wonders why Plaintiffs' counsel would want this information. If administrative costs are added to the formula, the losses under the formula increase!

### III. RTU HAS PROVIDED "BAD DEBT" INFORMATION AND AGREED TO AND WILL PROVIDE ADDITIONAL INFORMATION.

In Plaintiffs' Memorandum, in the chart on page 3, they next claim that they have not been provided all the bad debt information to which they are entitled. First, they assert "Defendant provided a single spreadsheet relating to bad debt for 2017 and 2018. That is a rank misstatement. In fact, RTU provided bad debt information for 2011, 2012, 2013, 2014, 2015, 2016 and 2017. These spreadsheets are Bates stamped as RTU adv. Terry 09273 through 09286. The documents provided and problems regarding them are addressed in Defendants response to Plaintiffs' meet and confer letter. Boucher Decl., Exhibit E at pages 5-6 [Document 88-7 at page 5-6] and Exhibit F. They were produced on January 3, 2019.

As noted in Exhibit F, there was a problem in that some of the pages listing bad debt were inadvertently omitted. In addition, the undersigned discovered that some bad debt had not been included (basically bad debt related to Safeway stores operated under a banner other than "Safeway). The undersigned now has all the corrected information and it will be Bates-stamped and the updated, current data produced within two days.[5]

### IV. RTU PROVIDED DETAILED INFORMATION REGARDING THE COST OF THERMAL PAPER.

In Plaintiffs' Memorandum, in the chart on page 3, they next assert that "Defendant has provided no information proving costs of tape." Once again this is inaccurate. At a hearing on that matter in March 2018, and again in May 2018, RTU provided Plaintiffs' counsel with a very detailed spreadsheet regarding the cost of tape. It is Bates-stamped RTU adv Terry – 04560.[6] That spreadsheet contains the following information for each year from 2009 through 2017: (1) base cost for a printed roll of tape per the 1999 agreement ($1.50 per roll) and a blank roll ($.94),

---

[5] The "bad debt" numbers are not helpful in the least to Plaintiffs' as they, in effect, lower the income numbers.

[6] This spreadsheet contains very sensitive, confidential information and was so marked pursuant to the Protective Order in place in this case. Pursuant to that order, absent an approval by the court to be filed under seal, it cannot be submitted.

(2) the cost adjustment for the increase or decrease in the cost of a roll of thermal paper for each of those years figured to one-thousandths of a dollar (during this time frame the price varied as much as $.12 upward and almost $.11 downward, (3) the adjusted price per roll (both printed and blank), the number rolls supplied (both printed and blank), the total cost of rolls supplied (both printed and blank) and the total cost for tape for each year.

In Paragraph 25 of his Declaration, Plaintiffs' counsel asserts Defendants' adjustment numbers are wrong based on Exhibit K. Plaintiffs' counsel either has no concept of what Exhibit K represents or is intentionally trying to mislead the court.[7] RTUI and Freedom Media agreed the base cost for a roll of printed tape would be $1.50 and a roll of blank tape would be $.94. Nowhere in the 1999 RTUI-Freedom Media agreement does it state that either numbers are the *actual* cost of rolls of tape. It was an *agreed* upon number so that there would be no need to constantly adjust the price based on precise actual costs. The parties did provide that the cost could vary up or down based on the varying price of thermal paper from the agreed upon base price. RTUI, during the 2000-2003, adjusted the price yearly. RTU has provided that information price changes for the 2009 through 2017 time frame.

Plaintiffs' counsel claims the numbers in Exhibit K show that RTU's tape costs were much lower. His understanding of the agreements between RTUI and Freedom Media and RTULP and Safeway are just wrong. First, Exhibit K is three different documents that were generated for Safeway and produced in discovery to Plaintiffs. At page 2, it shows the total number of *printed* rolls provided to Safeway in the 4th quarter of 2010 and the first quarter of 2011. No cost numbers are associated with those rolls. It also shows the number of blank rolls provided to Safeway for that same time frame. Pursuant to the 2009 Safeway-RTULP agreement, tape is provided to Safeway free of charge up to specified limits. If Safeway used more than the allotted amount, it had to pay RTU for excess rolls. The parties to that agreement negotiated a per roll amount for excessive tape usage. These are NOT the same baseline numbers negotiated by Plaintiffs in the

---

[7] Pursuant to that the Court's protective order, Exhibit K is duly marked as confidential document. In direct violation of that order, Plaintiffs' counsel did not file that document under seal.

1999 RTUI-Freedom Media Agreement.[8] Portion of page 2 of Exhibit K shows what the cost per roll would be if price increase for thermal paper were included.

Page 3 of Exhibit K has similar information for the first quarter of 2013. Page 4 is an invoice to Safeway for the fourth quarter of 2015 for excess tape usage at the price Safeway negotiated. This is not the same number that Plaintiffs' negotiated and no where in any agreement between RTU and Defendants is there a provision that the Defendants' negotiated price per roll would be the same as Safeway's negotiated price per roll a decade or more later.

## V. THERE IS NO LEGAL OR FACTUAL BASIS FOR THE SANCTIONS SOUGHT BY THE PLAINTIFFS.

In their Memorandum of Points and Authorities, Plaintiffs assert they are entitled to several forms of monetary and issues sanctions. All of these should be denied. Specifically, at page 9 of their Memorandum list the following issues sanctions and assert that these issues should be established as fact:

    A.    **Per the Safeway contract between Defendants and Plaintiffs RTU LP is a successor company to RTUI such that the contract applies to both RTU LP and RTUI.**

First, Plaintiffs have raised are no discovery issues whatsoever regarding the nature of RTUI and RTULP, when they were formed or the relationship between them. Second, all the basic information has always been publically available and, more importantly is contained in declarations by Doug Endsley. Plaintiffs have offered no complaint regarding the information in the declarations, *i.e,* that information has been improperly withheld. There is no reason whatsoever why the Court should order anything "established as fact" regarding the business organizations.

    B.    **That Defendant and Safeway "conducted" business throughout the period from 1999 to the present**.

This is at best a bizarre request. Clearly, RTUI had a contract with Safeway to provide

---

[8] It appears the adjust amount under the 1999 RTUI-Freedom Media Agreement may be a little lower than the adjust price negotiated by Safeway in its agreement with RTULP.

9

Defendants' Opposition to Plaintiffs' Motion to Compel for Violation of Court Order

register tape that started in 2000 and ended in December 2003. There is no evidence whatsoever that RTUI had a contract to provide ANYTHING to Safeway in 1999.

Similarly, the 2000-2003 RTUI-Safeway agreement terminated by its own terms in December 2003. Terry was actively involved in efforts to negotiate a replacement contract. Safeway instead entered a nation-wide agreement with a competitor. RTUI ceased selling ads for placement on Safeway register tape concurrent with the end of the contract in December 2003. Though RTULP tried to negotiate a register tape contract with Safeway beginning in June 2008, those efforts were unsuccessful. It was not until September of 2009 that RTULP and Safeway entered into a register tape agreement. Moreover, Terry certainly knew this to be the case because he did not sell any ads for place on Safeway tape between December 2003 and September 2009.

In sum, there is absolutely no legal or factual reason to conclude that RTUI or RTULP was "conducting" register tape business (or any business) with Safeway before approximately May 2000 or between December 2003 and September 2009. The Court cannot properly deem as "fact" a claim for which there is simply no basis.

    C.    **That the Safeway contract between Defendants and Plaintiffs (Complaint, Ex. F) remains a valid, enforceable contract to the present**.

Again, outside of Plaintiffs' allegation there is no factual or more importantly, any legal basis to reach this conclusion. RTUI and Freedom Media negotiated an agreement in 1999 that provided if RTUI, with Freedom Media's help, negotiated an agreement with Safeway, Freedom Media would receive the consideration specified in the 1999 agreement. That event occurred. Freedom Media (actually Crest) was paid. The Safeway agreement terminated by its own terms, effectively terminating any further obligation between RTUI and Plaintiffs for "gross profit" payments. Plaintiffs have offered no legal basis to reach any other conclusion. They cannot be permitted through a discovery dispute – in which the sole issues in dispute are production of documents relating to possible damages – to obtain an unrelated "established fact."

> D. **That Defendants incurred no "bad debt" affecting the gross profit calculation per the Safeway contract between Defendants and Plaintiffs (Complaint, Ex. F).**

As noted above, Defendants *have* provided information regarding bad debt. There were some errors which Defendants promptly pointed out. All of the updated information will have been provided to Plaintiffs long before the hearing and will reflect somewhat higher numbers. In fact, Defendants' counsel advised Plaintiffs' counsel that he had all the updated information in hand and try to provide it the next day. Plaintiffs' counsel's response: he immediately filed this motion.

> E. **That Defendants incurred no "administrative costs" affecting the gross profit calculation per the Safeway contract between Defendants and Plaintiffs (Complaint, Ex. F.)**

This is a very strange request as "administrative costs" are not a separate factor in the formula for calculating "gross profit." Nevertheless, there is no legal or factual basis for ordering this "fact" established as part of the discovery process.

> F. **That the cost of tape is fixed at the amounts readily provable by the documents at hand: printed tape cost at $1.0029 and blank tape cost at $0.85 per roll. (Boucher Dec. ¶ 25(f), Ex. I.)**

This is the most egregious request by far. First, Freedom Media agreed to base costs of for printed and blank tape in 1999 that would be adjusted based on the cost of thermal paper. A decade later, Safeway, not any of the Plaintiffs, negotiated a fixed price it would pay if it used tape in excess of the amount specified in its contract with RTULP. There is no factual basis to change the deal the Freedom Media negotiated. Moreover the number that Plaintiffs' counsel comes up with for printed tape is pure fantasy. Nowhere in any document does such a number appear.

> G. **That the higher numbers on the P&L statement are the correct numbers for sales per year, unless additional evidence proves those number are in fact higher. (Boucher Dec. ¶ 25(g).)**

Once again there is no factual basis to support this conclusion. The "P&L" statement was

generated in 2014 for prior counsel as a basis for settlement negotiations. The sales numbers are overstated. Plaintiffs have had the relevant numbers for 2010 through 2017 since February of 2018. They been provided with the sales numbers for 2009. There is no factual or legal reason to deem numbers provided during settlement as the actual sales numbers.

### H.  Profits for 2015–2018 were at least $9,174,964.

Once again there is NO factual support whatsoever for the conclusion that "profits for 2015 through 2018 were anywhere near this number.

## VI.  THERE IS NO BASIS TO AWARD MONETARY SANCTIONS.

Plaintiffs had all the relevant information they needed BEFORE they filed this motion with the exception of some updated "bad debt" information. There is no reasonable basis to award monetary sanctions.

## VII.  THERE NO REASON FOR ANY OTHER ORDERS REQUIRING DEFENDANTS TO PRODUCE DOCUMENTS.

At page 6 of the Memorandum, Plaintiffs suggest that they are entitled to numbers for sales for 2000-2004, 2003-2009 and 2015 to 2018. First, as Defendants have repeatedly stated in declarations in depositions, they have virtually no records from the 2000-2004 era as records were maintained in hard copy and most were lost in a warehouse flood. As Defendants have repeatedly stated there simply are no records for Safeway register tape sales from December 2003 to September 2009 because RTU had no contract with Safeway. RTU has provided the 2015-2018 sales information. RTU has not and is not obligated to create a summary spreadsheet with those numbers (as it did for 2009 through 2014 for settlement purposes.

## CONCLUSION

For all the reasons set forth above, Plaintiffs' motion should be denied, the Court should order Plaintiffs' to cure their violations of the Standing Protective Order (that is, get the confidential documents removed from public viewing) and require them to pay sanctions to RTU.

DATED: March 6, 2019             The Law Office of David J. Hamilton

*/s/ David J. Hamilton*

_____
David J. Hamilton
Attorney for Register Tapes Unlimited, LP and Register Tapes Unlimited, Inc.