1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                           ----oo0oo----

11

12   ROBERT TERRY; CREST CORPORATION;      No. 2:16-CV-00806 WBS AC
     and CREST IRREVOCABLE BUSINESS
13   TRUST DBA FREEDOM MEDIA,

14            Plaintiffs,
                                           MEMORANDUM AND ORDER RE:
15       v.                                DEFENDANTS' MOTION FOR
                                           SUMMARY JUDGMENT
16   REGISTER TAPES UNLIMITED, INC.;
     REGISTER TAPES UNLIMITED, L.P.;
17   EDWARD DOUGLAS ENDSLEY, and DOES
     1 through 50, inclusive,
18
              Defendants.
19

20                           ----oo0oo----

21            Plaintiffs Robert Terry, Crest Corporation, and Crest

22   Irrevocable Business Trust DBA Freedom Media brought this breach

23   of contract and disability discrimination, retaliation, and

24   harassment case against defendants Register Tapes Unlimited, Inc.

25   and Register Tapes Unlimited, L.P., and Edward Endsley, president

26   of Register Tapes Unlimited (collectively "RTUI").  Before the

27   court is defendants' motion for summary judgment.  (Docket No.

28
                                    1

114.)

I. <u>Factual and Procedural Background</u>

This case concerns RTUI's register tape advertising business.  Register tape advertising involves selling advertising space on the back of receipt tapes at grocery stores.  (Pls.' Statement of Undisputed Facts ("SUF") ¶ 6 (Docket No. 117-3.))  RTUI enters into agreements with grocery store chains to provide register tape with color advertising on the reverse side and then enters into agreements with local businesses to advertise on the grocery receipt tape at a specific grocery store or stores.  (<u>Id.</u> ¶ 6.)  RTUI uses sales representatives to identify local businesses who are interested in advertising on the register tape and to sell advertising contracts to those businesses.  (<u>Id.</u> ¶ 7.)

Plaintiff Terry was such a salesperson.  (<u>Id.</u> ¶ 9.)  Terry was also the owner of Freedom Media ("Freedom").  (<u>Id.</u> ¶ 9.)  Freedom contracted with companies like RTUI to sell register tape advertising in the area.  (<u>Id.</u> ¶ 9-10.)  Terry then sold register tape advertising to local businesses for Freedom.  (<u>Id.</u> ¶¶ 10-11.)  At the end of 2000, Terry incorporated Crest Corporation.  (<u>Id.</u> ¶ 25.)  Crest took over Freedom's business, and sales commissions for Freedom's contracts were thereafter paid to Crest.  (<u>Id.</u>)

A. <u>Safeway Agreements</u>

In October 1999, Freedom and RTUI entered into an agreement ("1999 Freedom-RTUI Agreement") that provided that if, with Freedom's assistance, RTUI secured a register tape contract with Safeway, Freedom would receive a portion of the gross

2

profits as that term was defined and calculated in the agreement. (Id. ¶ 18.) Under this contract, Freedom agreed to assist RTUI in obtaining an agreement with Safeway to provide it with register tape. In exchange for this assistance, Freedom would be entitled to a ten-percent share of the "gross profits" realized. (Id.)

In May 2000, RTUI signed a regional agreement with Safeway ("the 2000 Safeway-RTUI Agreement") pursuant to which RTUI would provide register tape to Safeway stores in the Seattle area, as well as the Baltimore/Washington, D.C./Northern Virginia metroplex. (Id. ¶ 22.) RTUI and Freedom agreed that Freedom would manage register advertising sales in the Seattle area. (Id. ¶ 23.) Terry subsequently moved to Seattle and acquired office space for Freedom in the area. (Id.) The 2000 Safeway-RTUI Contract expired in 2003 and subsequent negotiations for a new agreement were unsuccessful. (Id. ¶ 31, 32.)

From December 1, 2003 to September 2009, RTUI had no contractual right to place ads on Safeway register tape and did not provide any printed or blank register tape to Safeway. (Id. ¶ 33.) After RTUI lost the Safeway business, plaintiffs did not make any sales on behalf of RTUI or perform any work for RTUI until RTUI entered into a contract with Kroger around April 2004. (Id. ¶ 34.)

In 2009, Safeway advised RTUI that Safeway had cancelled its agreement with RTUI's competitor. (Id. ¶ 47.) On September 14, 2009, RTUI and Safeway entered into a nationwide agreement (the "2009 Safeway-RTUI Agreement") to provide register tape to Safeway stores and print third-party advertising on the

tape.  (Id. ¶ 48.)  Plaintiffs played no role in negotiating the
2009 agreement and there were no discussions with Safeway about
the plaintiffs during negotiations.  (Id. ¶ 49.)  Shortly before
the 2009 Safeway-RTUI Agreement was signed, RTUI notified all of
its sales agents, including plaintiffs, of the pending agreement
and advised that they could begin to solicit advertising for
placement on Safeway register tape.  (Id. ¶ 50.)  After RTUI and
Safeway signed the agreement, plaintiffs were assigned 45 Safeway
stores in the Sacramento area, to which Terry specifically
requested to be assigned.  (Id. ¶ 51.)

     In January 2011, Terry inquired for the first time into
whether he was entitled to a share of gross profits earned by
RTUI under the 2009 Safeway-RTUI Agreement, pursuant to the 1999
Freedom-RTUI Agreement.  (Id. ¶ 93.)

     B. Terry's Accident

     In October 2010, Terry was involved in an automobile
accident in Alaska.  (Id. ¶ 95.)  In February 2011, Terry sent an
email to RTUI to provide notice of the accident.  (Id. ¶ 65.)
Terry did not request any accommodation in his email and did not
file a workers' compensation claim.  (Id. ¶ 66.)  At an annual
sales meeting in February 2011, Terry told Endsley that the
accident had affected his short-term memory and speech but that
it had "started getting better."  (Id. ¶ 67.)

     In early 2011, RTUI contracted with Frank Mirahmadi, a
register tape salesperson, who would be reporting to Terry in the
Sacramento area.  (Id. ¶ 71.)  In the summer of 2013, Terry and
Mirahmadi got in a disagreement about a specific account.  (Id. ¶
72.)  Mirahmadi accused Terry of poaching the client.  (Id. ¶

72.)  In September 2013, Endsley decided to separate them and divided the Sacramento area between Terry and Mirahmadi.  (Id.)

On September 24, 2013, after Endsley had carved a separate area for Mirahmadi, RTUI received an email from Terry attaching a letter from his physician stating that Terry was "in need of accommodation for his work."  (Id. ¶ 73.)  RTUI responded stating that "the control and method of [Terry's] work, including the hours worked and how [he] work[s], is dependent on [Terry]. Any accommodations or adjustments in how [Terry] perform[s] the work must be made by [Terry]."  (Id. ¶ 74.)  Terry responded and characterized RTUI's answer as "denying accommodation."  (Id. ¶ 75.)  RTUI once again responded and reiterated that all accommodations must be made by Terry because he controls the way he performs the job.  RTUI then offered "the same compensation structure with decreased responsibilities."  (Id. ¶ 76.)  Terry continued to make sales for Crest.  (Id. at 77.)

C. Plaintiffs' Suit

Plaintiff filed suit on January 16, 2016 and alleged the following ten causes of action: (1) breach of the 1999 Freedom-RTUI Agreement; (2) breach of implied covenant of good faith and fair dealing; (3) disability discrimination in violation of California's Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12926; (4) failure to engage in the interactive process in violation of FEHA; (5) failure to accommodate in violation of FEHA; (6) retaliation in violation of FEHA; (7) hostile work environment and harassment in violation of FEHA; (8) failure to prevent discrimination in violation of FEHA; (9) wrongful adverse action in violation of public policy; and

(10) failure to pay wages pursuant to the Labor Code.[1]  Count

Seven of the Second Amended Complaint ("SAC") was dismissed

pursuant to the parties' stipulation on June 21, 2017. (Docket

No. 43.)  Defendants now move for summary judgment on the

remaining claims.  (Docket No. 114.)

II. <u>Legal Standard</u>

Summary judgment is proper "if the movant shows that

there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a).  A material fact is one that could affect the outcome

of the suit, and a genuine issue is one that could permit a

reasonable jury to enter a verdict in the non-moving party's

favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

(1986).

The party moving for summary judgment bears the initial

burden of establishing the absence of a genuine issue of material

fact and can satisfy this burden by presenting evidence that

negates an essential element of the non-moving party's case.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986).

Alternatively, the movant can demonstrate that the non-moving

party cannot provide evidence to support an essential element

upon which it will bear the burden of proof at trial.  <u>Id.</u>  Any

inferences drawn from the underlying facts must, however, be

viewed in the light most favorable to the party opposing the

motion.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475

---

[1]    Plaintiffs do not cite what section of the Labor Code
defendants allegedly violated, either in the Second Amended
Complaint or in their opposition to defendants' motion for
summary judgment.

U.S. 574, 587 (1986).

III. <u>Breach of Contract (Count One)</u>

    1. <u>Terry's Claim for Breach of Contract</u>

Defendant contends that Terry's claim pursuant to the 1999 Safeway Agreement should be dismissed because he was not a party to the agreement.  The court agrees.  A cause of action for breach of contract requires plaintiff to show that a contract between the parties existed.  <u>CDF Firefighters v. Maldonado</u>, 158 Cal. App. 4th 1226, 1239 (2008).  Terry signed the 1999 Safeway Agreement as a "Trustee, for and on behalf of Freedom Media," and not in his individual capacity.  (SAC Ex. E "1999 Safeway Agreement.")  Because Terry was not a party to the contract, defendants cannot be liable to Terry for breach of this agreement.  <u>See</u> <u>Conder v. Home Sav. of Am.</u>, 680 F. Supp. 2d 1168, 1174 (C.D. Cal. 2010).  Accordingly, the court will grant partial summary judgment as to Terry's claim.

    2. <u>Freedom's Claim for Breach of Contract</u>

"A cause of action for breach of contract requires proof of the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach."  <u>CDF Firefighters</u>, 158 Cal. App. 4th at 1239.  Defendants contest only the breach and damages elements of this claim.

Defendants argue that the 1999 Freedom-RTUI Agreement applied only to the 2000 RTUI-Safeway Agreement that expired in 2003.  If so, plaintiffs were not entitled to compensation for profits under the 2009 Safeway Agreement and defendants therefore

7

did not breach the agreement.  The agreement describes how

Freedom "has initiated negotiations with Safeway . . . to enter

into a contract whereby R.T.U.I. will provide register tape to

Safeway in exchange for the rights for R.T.U.I. to sell third-

party advertising to be printed on the back of the register

receipt tapes."  (SAC Ex. F.)  Defendants argue that the 1999

Freedom-RTUI Agreement thus refers to a specific agreement

already contemplated at the time of the drafting of the 1999

Freedom-RTUI Agreement -- and not all future contracts -- because

the 1999 Freedom-RTUI agreement goes on to state that "Freedom is

assisting R.T.U.I. in negotiations to obtain the aforementioned

agreement between Safeway and R.T.U.I.," that "R.T.U.I. desires

to obtain the agreement," and that "Freedom hereby agrees to

assist R.T.U.I. in obtaining the aforementioned agreement with

Safeway."  (Id.)  Under defendants' view, the 1999 Freedom-RTUI

Agreement entitled plaintiffs to compensation only under the 2000

RTUI-Safeway Agreement.

Plaintiffs in turn argue that the language in the

contract is ambiguous and therefore summary judgment is

inappropriate.  Specifically, Plaintiffs contend that the 1999

Freedom-RTUI Agreement committed RTUI to compensate Freedom for

any and all business RTUI did with Safeway thereafter.

Plaintiffs rely on the clause that states that RTUI "will pay

Freedom ten percent (10%) of gross profit for as long as R.T.U.I

or its successors conduct business with Safeway."  (SAC Ex. F.)

Under plaintiffs' view, the phrase "conduct business" does not

limit defendants' contractual obligations to any particular

contract.  Instead, because defendants were in talks with Safeway

8

for an indeterminate time between the two Safeway contracts, defendants have been conducting business with Safeway since the 2000 RTUI-Safeway Agreement. Accordingly, under that interpretation, defendants' failure to compensate plaintiff for profits made under the 2009 Safeway Agreement breached the 1999 Freedom-RTUI Agreement.

Under California law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Id. at § 1638. "[T]he intention of the parties is to be ascertained from the writing alone, if possible." Id. at § 1639. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Id. at § 1641.

"The Court's determination of whether an ambiguity exists is a question of law." Centigram Argentina, S.A. v. Centigram Inc., 60 F. Supp. 2d 1003, 1007 (N.D. Cal. 1999) (citing WYDA Assocs. v. Merner, 42 Cal. App. 4th 1702, 1710 (1996). "[W]hen two equally plausible interpretations of the language of a contract may be made parole evidence is admissible to aid in interpreting the agreement." WYDA Assocs., 42 Cal. App. 4th at 1710; see also Meridian Project Sys., Inc. v. Hardin Const. Co., LLC, 426 F. Supp. 2d 1101, 1109 (E.D. Cal. 2006). "If there is no material conflict over extrinsic evidence, the court may interpret an ambiguous term as a matter of law." Best

Buy Stores, L.P. v. Manteca Lifestyle Ctr., LLC, 859 F. Supp. 2d 1138, 1147 (E.D. Cal. 2012) (citing Lonely Maiden Prods., LLC v. GoldenTree Asset Mgmt., LP, 201 Cal. App. 4th 368, 377 (2d Dist. 2011)).

The court finds the language in the 1999 Freedom-RTUI Agreement to be unambiguous. First, the circumstances that the 1999 Freedom-RTUI Agreement clearly describes refer only to a previously contemplated contract with Safeway, and not any future contracts. The 1999 Freedom-RTUI Agreement describes how "Freedom has initiated negotiations with Safeway" specifically to obtain "a contract whereby R.T.U.I. will provide register tape." (SAC Ex. F.) The 1999 Freedom-RTUI Agreement describes the purpose of the 1999 Freedom-RTUI Agreement: "R.T.U.I. desires to obtain the agreement [with Safeway] and have Freedom assist in the negotiating an agreement [with Safeway] on behalf of R.T.U.I." (Id.) As a result, under the 1999 Freedom-RTUI Agreement, Freedom "agree[d] to assist R.T.U.I. in obtaining the aforementioned agreement [with Safeway]." (Id.) The background information memorialized in the agreement, and Freedom's obligations under the agreement, refer only to a previously contemplated contract for register tape.

Second, because Freedom's only obligation under this agreement is to negotiate a previously contemplated contract, it is unreasonable to interpret the commissions clause to entitle Freedom to payment in perpetuity. A contract is ambiguous only if it is "reasonably susceptible" to multiple reasonable interpretations. Brobeck, Phleger & Harrison v. Telex Corp., 602 F.2d 866, 871 (9th Cir. 1979). Plaintiffs' request for the

10

court to read the contract to entitle Freedom to indefinite
payments regardless of the value, length, or content of the
contract negotiated in 1999 by Freedom, or despite Freedom's lack
of participation in future Safeway contracts, is not reasonable.
Indeed, plaintiffs' interpretation would grant plaintiff profits
that were clearly not contemplated by the parties in the 1999
Freedom-RTUI contract.  The 1999 Freedom-RTUI Agreement binds
Freedom to assisting RTUI in obtaining a contract for "register
tape" only (SAC Ex. F), but plaintiffs seek "10% <u>gross profit</u> for
register tape, Customer Information Center displays ('CIC'),
shopping cart advertisements, and bench seating advertising at
Safeway stores" from other RTUI-Safeway contracts.  (SAC ¶
17(a).)  The 1999 Freedom-RTUI Agreement, however, defined "gross
profit" to mean "profit after <u>cost of tape</u> and total paid
commissions," and thus clearly contemplated profits for only
register tape and an agreement involving only register tape. (<u>See</u>
SAC Ex. F (emphasis added).)

      Finally, the phrase "as long as R.T.U.I. or its
successors conduct business" does not create ambiguity.   The
phrase is not part of a general clause.  Instead, the phrase
modifies the previous paragraph wherein the parties again mention
a specific and previously contemplated contract with Safeway:

> Freedom hereby agrees to assist R.T.U.I. in
> obtaining the aforementioned agreement with
> Safeway.  R.T.U.I. agrees to compensate Freedom
> upon consummation of an agreement with Safeway in
> exchange for the following covenants and fees:
>
> R.T.U.I. or its successors will pay Freedom ten
> percent (10%) of gross profit for as long as
> R.T.U.I. or its successors conduct business with
> Safeway, its subsidiaries, or any successor

company of Safeway for sales made by R.T.U.I . . . .

(Id.)  Further, the 1999 Freedom-RTUI Agreement explicitly conditions compensation on "consummation of an agreement with Safeway" and, contrary to plaintiffs' contention, does not entitle Freedom to compensation for R.T.U.I.'s "communications with Safeway" in the time between the two contracts.  (SAC Ex. F; Pls.' Opp. Mot. Summ. J. at 23.)

Plaintiffs' only evidence suggesting that the 1999 Freedom-RTUI Agreement was to apply to all business with Safeway thereafter is the lack of contact between RTUI and Safeway prior to the 2000 RTUI-Safeway Agreement.  Plaintiffs contend that "the sole and important purpose of the Safeway Agreement was to introduce Defendants to Safeway."  (Pls.' Opp. Mot. Summ. J. at 23.)  But "parol evidence is admissible only to prove a meaning to which the language is 'reasonably susceptible,' not to flatly contradict the express terms of the agreement."  Winet v. Price, 4 Cal. App. 4th 1159, 1167 (1992).  The 1999 Freedom-RTUI Agreement does not compensate Freedom for introducing RTUI to Safeway.  Instead, the 1999 Freedom-RTUI Agreement explicitly declares that the "covenants and fees" will be for the "consummation of an agreement" after "Freedom . . . assist[s] R.T.U.I. in obtaining" an agreement with Safeway for register tape, for which Freedom "ha[d] [already] initiated negotiations" at the time of the 1999 Freedom-RTUI Agreement.  (SAC Ex. F.)

Indeed, plaintiffs' conduct after the 1999 Freedom-RTUI Agreement confirms that the agreement applied only to the specific contract negotiated by Freedom on behalf of RTUI.  RTUI

notified all sales agents, including plaintiffs, of the pending agreement with Safeway shortly before 2009 and advised that they could solicit advertising for placement on Safeway register tape. (Pls.' SUF ¶ 50.)  After the 2009 Safeway Agreement was signed, plaintiff Crest was assigned about 45 Safeway stores in the Sacramento area.  (Pls.' SUF ¶ 51.)  Terry specifically requested Crest be assigned to those stores.  (Pls.' SUF ¶ 51.)  Terry did not ask about gross profits until 2011 despite being fully aware that defendants were selling register tape to Safeway since 2009. (Pls.' SUF ¶ 93.)  The language of the contract, the circumstances surrounding the creation of the contract, and plaintiffs' behavior after the parties entered into the contract all support the conclusion that the 1999 Freedom-RTUI Agreement applied only to the 2000 RTUI-Safeway Agreement, and not all future business with Safeway.  Accordingly, defendants' failure to pay plaintiffs a share of profit under the 2009 Safeway Agreement does not violate the 1999 Freedom-RTUI Agreement and this claim fails as a matter of law.  The court will therefore grant summary judgment as to Count One.

IV.  Breach of the Implied Duty of Good Faith and Fair Dealing
     (Count Two)

     "The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." Guz v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 349 (2000).  "[I]f the plaintiff's allegations of breach of the covenant of good faith 'do not go beyond the statement of a mere contract breach

13

and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.'" Deerpoint Grp., Inc. v. Agrigenix, LLC, 345 F. Supp. 3d 1207, 1240 (E.D. Cal. 2018) (citing Bionghi v. Metro. Water Dist., 70 Cal. App. 4th 1358, 1370 (2d Dist. 1999); Careau & Co., 222 Cal. App. 3d 1371, 1395 (2d Dist. 1990).

Here, plaintiffs' claim for breach of the implied duty of good faith and fair dealing is superfluous. First, the alleged acts under each claim are the same. Plaintiffs' breach of contract claim relies on defendants allegedly "failing to provide Plaintiff with correct payment per the terms of the contracts and by failing to provide Plaintiff with the necessary documentation for him to ascertain the exact amount of . . . underpayments." (SAC ¶ 41.) The claim for breach of the duty of good faith and fair dealing similarly relies on defendant "fail[ing] to provide Plaintiff with the necessary documentation for him to ascertain the exact amount of . . . underpayments." (SAC ¶ 46.) Second, plaintiffs seek the same damages under both claims. Both claims allege loss of "percentages of profits" from business with Safeway in the amount of $5,000,000. (SAC ¶¶ 41, 43, 46, 48.) Plaintiffs' allegations for breach of the implied duty of good faith and fair dealing, "do not go beyond the statement of a mere contract breach." See Deerpoint, 345 F. Supp. 3d at 1240. Accordingly, the court will grant summary judgment as to Count Two.

V. <u>FEHA Claims (Counts Three, Four, Five, Six, and Eight)</u>[2]

Plaintiff asserts six claims under California's Fair Employment and Housing Act (FEHA).  Defendants move for summary judgment on all claims and argue plaintiff Terry is not an employee under the meaning of the statute.

FEHA does not protect independent contractors.  <u>S.G. Borello & Sons, Inc. v. Dep't. of Indus. Relations</u>, 48 Cal. 3d 341, 359 (1989).  For the purposes of FEHA, an employee is "any individual under the direction and control of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written . . . .  Employee does not include an independent contractor as defined in Labor Code Section 3353."  Cal. Code Regs. tit. 2, §§ 7286.5(b) & 7286.5(b)(1); <u>see also</u> <u>Strother v. S. Cal. Permanente Med. Grp.</u>, 79 F.3d 859, 866 (9th Cir. 1996).  Section 3353 of the Labor Code defines an independent contractor as "any person who renders service for a specified recompense or a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished."  Cal. Labor Code § 3353.

In evaluating an employment relationship, "traditional common law principles of agency and respondeat superior supply the proper analytical framework under FEHA."  <u>Patterson v. Domino's Pizza, LLC</u>, 60 Cal. 4th 474, 499 (2014).  In FEHA cases, "courts consider the totality of the circumstances bearing on the

---

[2]    Terry is not claiming any violation of FEHA on behalf of Plaintiffs Freedom and Crest.  Because Freedom and Crest are not parties to any remaining claim, the court will dismiss Freedom and Crest from this action.

nature of the work relationship of the parties, with an emphasis on the extent to which the defendant controls the plaintiff's performance of employment duties." Rhodes v. Sutter Health, 949 F. Supp. 2d 997, 1003 (E.D. Cal. 2013) (citing Hall v. Apartment Inv. & Mgmt. Co., Civ. No. 08-03447, 2011 WL 940185, at *5 (N.D. Cal. Feb. 18, 2011); Vernon v. State, 116 Cal. App. 4th 114, 124 (1st Dist. 2004)).

Other factors to be taken into account include "payment of salary or other employment benefits and Social Security taxes, the ownership of the equipment necessary to performance of the job, the location where the work is performed, the obligation of the defendant to train the employee, the authority of the defendant to hire, transfer, promote, discipline or discharge the employee, the authority to establish work schedules and assignments, the defendant's discretion to determine the amount of compensation earned by the employee, the skill required of the work performed and the extent to which it is done under the direction of a supervisor, whether the work is part of the defendant's regular business operations, the skill required in the particular occupation, the duration of the relationship of the parties, and the duration of the plaintiff's employment." Id. (quoting Vernon, 116 Cal. App. 4th at 125).

"Of these factors, the extent of the defendant's right to control the means and manner of the workers' performance is the most important." Vernon, 116 Cal. App. 4th at 126. "'A finding of the right to control employment requires . . . a comprehensive and immediate level of "day-to-day" authority over employment decisions.'" Doe I v. Wal-Mart Stores, Inc., 572 F.3d

677, 682 (9th Cir.2009) (quoting <u>Vernon</u>, 116 Cal. App. 4th at 127–28).

The court finds that there is an issue of material fact as to whether or not Terry was RTUI's employee.  Although Terry was free to determine his schedule, breaks, and hours, and was not subject to sale quotas (Pls.' SUF ¶ 62), RTUI controlled the product Terry could sell, the price that Terry could charge, for whom Terry could sell ads, and where Terry could sell ads.  Although Terry was "authorized to sell any[]" kind of advertisement, Terry sold only "what Doug [Endlsey] t[old] [him] he want[ed] [him] to."  (Terry Dep. at 41: 14-21.)  RTUI determined the price salespeople could charge because salespeople were required to follow RTUI's national rate cards.  (Krocak Dep. at 79:23-25.)  <u>Cf.</u> <u>Toyota Motor Sales U.S.A., Inc. v. Superior Court</u>, 220 Cal. App. 3d 864, 876 (2d Dist. 1990) (finding that plaintiff was an employee where "[defendant] determined what would be delivered, when and to whom and what price would be charged.").  RTUI also limited for whom Terry could sell ads and had the "authority to discharge" him.  <u>See</u> <u>Vernon</u>, 116 Cal. App. 4th at 125.  "If somebody went to work for the competitor, Doug [Endsley] would fire them."  (Terry Dep. at 111:9-11.)  Further, RTUI determined where Terry could and could not sell ads.  After the dispute with Mirahmadi, RTUI created a district for Mirahmadi where Terry could no longer work.  (Pls.' SUF ¶ 72.)  Whether RTUI's control over Terry's work suffices to establish an employer-employee relationship is thus a question of fact.

Moreover, although defendants emphasize that RTUI never withheld taxes for Terry, never provided insurance, and never

reimbursed Terry for employment expenses (Pls.' SUF ¶¶ 57-61),
those facts are insufficient for the court to grant summary
judgment.  "An employer cannot change the status of an employee
to one of independent contractor by illegally requiring him to
assume burdens which the law imposes directly on the employer."
Toyota, 220 Cal. App. 3d at 877.  These facts are "merely the
legal consequences of an independent contractor status not a
means of proving it."  Id.  Instead, "[t]he issue here is whether
[Terry] was an independent contractor in the first place who was
legally obligated to pay his own taxes."  Hennighan v. Insphere
Ins. Sols., Inc., 38 F. Supp. 3d 1083, 1106 (N.D. Cal. 2014); cf.
Toyota, 220 Cal. App. 3d at 876 (finding that plaintiff providing
"his own car, expenses and insurance" is "at most" a "'a
secondary element,' and, without more, worthy of little weight").

Finally, defendants emphasize that RTUI never paid
Terry directly, which "while not controlling, is at least strong
evidence that an employment relationship did not exist."  Vernon,
116 Cal. App. 4th at 126.  But the record is inconclusive.  While
defendants contend that RTUI "made all commission payments" to
Crest, plaintiffs argue that two to three years ago RTUI changed
the payee from Crest to Terry.  (Pls.' SUF ¶ 53; Terry Dep. at
67:6-25.)  Accordingly, the court cannot at this stage determine
that an employer-employee relationship did not exist.

A.   FEHA Disability Discrimination (Count Three)

"To establish a prima facie case of disability
discrimination, a plaintiff must show that: (1) she suffered from
a disability; (2) could perform the essential duties of the job
with or without reasonable accommodations, i.e., she was a

'qualified individual'; and (3) was subjected to an adverse employment action because of the disability. McCarthy v. R.J. Reynolds Tobacco Co., 819 F. Supp. 2d 923, 934 (E.D. Cal. 2011) (quoting Brundage v. Hahn, 57 Cal. App. 4th 228, 236 (2d Dist.1997)).  Defendants argue that plaintiff cannot recover for discrimination as a matter of law because Terry could not perform the essential duties of the job.

The court finds an issue of material fact as to Terry's ability to perform the essential duties of the job.  On the one hand, by Terry's own allegaations he suffers from impaired memory and "processing speed," "migraines," "low energy," "fatigue," and a "reduced ability to work for an extended period" of time.  (SAC ¶ 28.)  On the other, defendants concede that after Terry asked for accommodation and after that accommodation was denied, Terry "continued to make new sales and renewal sales in Alaska and to a limited extent the Sacramento area stores that he retained.  He also made sales and renewals for register tape advertising . . . for placement on stores in Washington, Oregon and Idaho and elsewhere."  (Pls.' SUF ¶ 77.)  Further, although Terry's sales levels were declining (Pls.' SUF ¶ 79), Terry was not subject to any sales quotas, so the number of sales was not an essential component of the job he was hired to perform.  Accordingly, the court cannot conclude that plaintiff could not perform his job "with or without accommodation" as a matter of law.  See McCarthy, 819 F. Supp. 2d at 934.  The court will therefore deny defendants' motion as to Count Three.

B.    Failure to Engage in Interactive Process (Count Four)

Under FEHA, "[o]nce an employer becomes aware of the

need for accommodation, that employer has a mandatory obligation . . . to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." Ravel v. Hewlett-Packard Enter., Inc., 228 F. Supp. 3d 1086, 1097 (E.D. Cal. 2017) (quoting Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1137 (9th Cir. 2001)). "The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process." Id. "Employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." Id. at 1137-38. Defendants argue that, as a matter of law, defendants engaged in the interactive process with Terry.

The court disagrees and finds an issue of material fact. After Terry first requested accommodation, RTUI told Terry that "[a]ny accommodations or adjustments in how [Terry] perform[s] the work must be made by [Terry]." (Pls.' SUF ¶ 74.) After Terry took RTUI's response as a denial of accommodation, RTUI again responded stating that "any accommodation must come from [Terry] because as an Independent contractor [Terry] control[s]" how he performs his job. (Pls.' SUF ¶ 76.) RTUI also offered "the same compensation structure with decreased responsibilities." (Id.) In this second response, RTUI offered to meet with Terry to discuss his situation. (Id.) Whether RTUI's offer to meet with Terry to further discuss the issue, after clearly telling Terry that all accommodations must be made by him, suffices as engagement is a question for the trier of

fact.  Accordingly, the court will deny defendants' motion as to Count Four.

   C.   Failure to Accommodate (Count Five)

   "A reasonable accommodation is 'a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired.'" McCarthy, 819 F. Supp. 2d at 935.  Defendants argue that there was no reasonable accommodation available and that defendants did accommodate Terry by "relieving Terry of some work volume" and by hiring Mirahmadi to alleviate some of Terry's workload.  (Mot. Summ. J. at 45, 47.)

   "An 'employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts' that 'reasonable accommodation was offered and refused,' that 'there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation,' or that 'the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith.'" Dep't of Fair Employment & Hous. v. Lucent Techs., Inc., 642 F.3d 728, 743-44 (9th Cir. 2011) (quoting Jensen v. Wells Fargo Bank, 85 Cal. App. 4th 245 (2000)).

   Defendants have not carried their burden.  First, the hiring of Mirahmadi was never "offered" as an accommodation to Terry.  By defendants' admission, Mirahmadi was hired because Mirahmadi reached out to Finkelstein and because he had a good

reputation as a salesperson.  (Pls.' SUF ¶ 71.)  Defendants offer no evidence suggesting that RTUI hired Mirahmadi in order to accommodate Terry.

Further, defendants have not established how the lower-volume accommodation was reasonable given Terry's doctor's report of Terry's "[m]ild orientation loss," "sustained attention impairments," and "[m]oderate impairments in cognitive proficiency."  (Boucher Decl. Ex. H at 2.)  Defendants also did not offer a different position within the company.  Finally, defendants have failed to show that they did "everything in [their] power to find a reasonable accommodation," because they have not offered any evidence to suggest that they considered Terry's proposed accommodation of hiring a personal assistant for him.  (See id. at 6.)  Accordingly, the court cannot determine, as a matter of law, that, given Terry's condition, RTUI's suggestions and actions constituted reasonable accommodations. The court will therefore deny defendants' motion as to Count Five.

D.   Retaliation (Count Six)

"Retaliation occurs when a plaintiff engages in protected activity and suffers an adverse employment action as a result."  Leland v. City & Cty. of San Francisco, 576 F. Supp. 2d 1079, 1091 (N.D. Cal. 2008) (citing Cornwell v. Electra Central Credit Union, 439 F.3d 1018, 1034-35 (9th Cir. 2006)). California Government Code § 12940(h) makes it unlawful for "any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under [FEHA]."  The phrase "otherwise discriminate"

encompasses "the same forms of adverse employment activity that is actionable under section 12940(a)", namely "'ultimate employment actions' such as termination or demotion, but also the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career." Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1050-51, 1054 (2005).

Here, plaintiffs offer evidence that suggests that RTUI did retaliate against Terry. William Krocak, RTUI's Director of Human Resources, stated that he may have had discussions with RTUI about getting rid of Terry. (Krocak Dep. at 194:14-20.) Krocak also agreed that RTUI's suggestion for Terry to work less constituted a demotion from Regional Sales Manager to Independent Marketing Consultant. (Id. at 179.) Further, although RTUI divided Sacramento between Mirahmadi and Terry before Terry asked for accommodations, since that division, Terry has been unable to generate new business, has had his territory further diminished, and has allegedly not been provided with an adequate sales force. (Terry Decl. ¶¶ 13-16.) These facts create an issue of material fact as to whether defendants retaliated against plaintiff. Accordingly, the court will deny defendants' motion as to Count Six.

    E.  Failure to Prevent Discrimination and Retaliation
        (Count Eight)

It goes without saying that anytime a defendant discriminates it also by definition fails to prevent discrimination. Defendants' only argument against plaintiffs' claim for failure to prevent discrimination depends on the court granting summary judgment as to plaintiffs' claim for

discrimination (Count Three).  Because the court will not grant summary judgment as to the discrimination claim, it will also deny summary judgment as to Count Eight.

VI. <u>Wrongful Action in Violation of Public Policy (Count Nine)</u>

Defendants argue that Terry's disability was not a substantial factor in any alleged adverse employment action.  For the reasons discussed under the retaliation claim, the court finds an issue of material fact as to whether Terry's disability was a factor in RTUI's subsequent adverse treatment of Terry.  Accordingly, the court will deny summary judgment as to Count Nine.

V. <u>Failure to Pay Wages (Count Ten)</u>

Defendants argue only that Terry is not an employee and is therefore not entitled to wage protections under the California Labor Code.  Like under FEHA claims, "[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." <u>S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations</u>, 48 Cal. 3d 341, 350 (1989).  Courts also consider "(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time

or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." Narayan v. EGL, Inc., 616 F.3d 895, 900 (9th Cir. 2010) (citing Borello, 48 Cal. 3d 341, 351 (1989)).

As discussed above, RTUI controlled the product Terry could sell, the price that Terry could charge, for whom Terry could work, and where Terry could sell ads. As to the secondary factors, Terry was one of many salespersons, was subject to Endsley's instructions, and had been working for defendant for over 20 years. The evidence thus creates a triable issue of fact as to whether Terry was an employee. Accordingly, the court will deny summary judgment as to Count Ten.

IT IS THEREFORE ORDERED that defendants' Motion for Summary Judgment (Docket No. 114) be, and the same hereby is, GRANTED as to Claims One and Two of the Second Amended Complaint.

IT IS FURTHER ORDERED that defendants' Motion for Summary Judgment be, and the same hereby is, DENIED as to Claims Three, Four, Five, Six, Eight, Nine, and Ten of the Second Amended Complaint.

Dated: March 3, 2020

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE